UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Boustead Securities, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>CleanCore Solutions, Inc. f/k/a CC Acquisition Corp.,<br><br>Defendant. | : | Case No. 1:26-cv-04946-MMG<br><br>***Oral Argument Requested*** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**


Edward W. Larkin, Esq.
Lola Ashirmetov, Esq.
FBT Gibbons LLP
1 Pennsylvania Plaza, Suite 4515
New York, New York 10119
Tel.: 212-613-2000
elarkin@fbtgibbons.com
lashirmetov@fbtgibbons.com

*Counsel for Plaintiff,*
*Boustead Securities, LLC*


Dated: September 30, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

FACTS .......... 2

A. CleanCore's Breaches of Its Contractual Obligations Under the Engagement Agreement. .......... 2

B. The Parties Negotiated Two Settlement Agreements to Resolve CleanCore's Payment Defaults. .......... 3

C. CleanCore Breached Multiple Provisions of the Second Settlement Agreement. .......... 5

1. CleanCore Failed to Register the Settlement Shares for Resale by the Contractual Deadline, Causing Boustead Over $2.3 Million in Losses. .......... 5

2. CleanCore Delivered Defective Warrants and Ignored Boustead's Repeated Demands to Cure. .......... 6

STANDARD OF REVIEW .......... 7

ARGUMENT .......... 7

A. The Complaint States a Plausible Claim That CleanCore Breached Section 1 by Failing to Issue "Free Trading" Shares "Registered for Resale" by September 30, 2025. .......... 9

B. The Complaint States a Plausible Claim That CleanCore Breached Section 2 by Depriving Boustead of Its Contractual Right to "Retain" Exercisable Initial Warrants. .......... 15

CONCLUSION .......... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 7

*Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*,
692 F.3d 42 (2d Cir. 2012) .......... 8, 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 7

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269 (2011) .......... 16

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) .......... 7

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42 (2d Cir. 2011) .......... 8

*DivX, LLC v. Harman Int'l Indus., Inc.*, 237 A.D.3d 466 (1st Dep't 2025) .......... 12, 16

*Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239 (2014) .......... 8

*Erickson v. Pardus*, 551 U.S. 89 (2007) .......... 7

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004) .......... 8, 12

*Giray v. Ulukaya*, 212 A.D.3d 439 (1st Dep't 2023) .......... 13

*Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562 (2002) .......... 8, 12

*Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pitt.*,
530 F. Supp. 3d 447 (S.D.N.Y. 2021) .......... 13

*In re Lipper Holdings, LLC*, 1 A.D.3d 170 (1st Dep't 2003) .......... 10, 16

*Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136 (2d Cir. 2011) .......... 16

*Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60 (2d Cir. 2010) .......... 8

*Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900 (1987) .......... 11

*Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of City of N.Y.*, 28 N.Y.2d 101 (1971) .......... 16

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458 (2d Cir. 2010) .......... 8, 12

*McCray v. Lee*, 963 F.3d 110 (2d Cir. 2020) .......... 7

*Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195 (2001) ....................13

*Rosenblatt v. Christie, Manson & Woods Ltd.*,
195 F. App’x 11 (2d Cir. 2006) (summary order) ....................12

*Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144 (2d Cir. 2023) ....................11

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) (plurality opinion) ....................11

*W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157 (1990) ....................8, 12

**Rules**

Fed. R. Civ. P. 12(b)(6) ....................7

**Other Authorities**

*Retain*, Merriam-Webster, https://www.merriam-webster.com/dictionary/retain (last visited Sept. 10, 2026) ....................15

Plaintiff Boustead Securities, LLC ("Boustead" or "Plaintiff") submits this Memorandum of Law in Opposition to Defendant CleanCore Solutions, Inc. f/k/a CC Acquisition Corp.'s ("CleanCore" or "Defendant") Motion to Dismiss (the "Motion" or "Mot.") the Complaint ("Compl."). For the reasons set forth herein, the Motion should be denied.

## PRELIMINARY STATEMENT

CleanCore's Motion should be denied. The Complaint alleges straightforward breaches of the Second Settlement Agreement (Dkt. 1-4) that state plausible claims for relief. CleanCore agreed to issue Boustead 375,000 Settlement Shares that would be "free trading without any restrictions," to include them "in the next registration statement filed by CleanCore," *and* to register them "for resale no later than September 30, 2025." CleanCore breached each of these obligations. Specifically, the Complaint alleges that: (1) CleanCore omitted the Settlement Shares from the Prospectus—i.e., "the next registration statement"—filed just six (6) days after execution of the Second Settlement Agreement; (2) CleanCore waited until September 24, 2025, to file the September S-3, which was subject to review by the Securities and Exchange Commission (the "SEC"); (3) CleanCore withdrew that registration statement on November 7, 2025, and filed the WKSI S-3 at the close of the trading day—more than a month after the deadline—without notifying Boustead; and (4) the Settlement Shares' value plummeted from $2,572,500 to approximately $176,000 by the time Boustead discovered the WKSI S-3 filing on November 11, 2025—a loss of over $2.3 million caused entirely by CleanCore's delay. The Complaint further alleges that CleanCore delivered defective Initial Warrants to Boustead in June 2025 and ignored repeated demands to correct them, rendering worthless Boustead's contractual right to "retain" those warrants.

CleanCore's Motion rests on an artificially narrow reading of its own contractual obligations—one that disregards the plain language of the Second Settlement Agreement, ignores

its own post-deadline conduct, and improperly invites the Court to make factual findings at the pleading stage. Accepting the Complaint's well-pleaded allegations as true and drawing all reasonable inferences in Boustead's favor, the Complaint states a plausible breach of contract claim under Sections 1 and 2 of the Second Settlement Agreement. Boustead pleads its *quantum meruit* and unjust enrichment claims in the alternative and does not oppose their dismissal without prejudice, provided that CleanCore does not dispute the validity and enforceability of the Second Settlement Agreement.

## FACTS[1]

### A. CleanCore's Breaches of Its Contractual Obligations Under the Engagement Agreement.

On September 21, 2022, CC Acquisition Corp. (now CleanCore Solutions, Inc.) entered into an engagement agreement with Boustead (the "Engagement Agreement"), pursuant to which Boustead agreed to act as CleanCore's exclusive financial advisor in connection with its financing activities, including an initial public offering ("IPO"). (Compl. ¶ 8 (Dkt. 1), Ex. 1 (Dkt. 1-1).) The Engagement Agreement obligated CleanCore to pay certain success fees and granted Boustead a right of first refusal ("ROFR") for two (2) years following the later of the consummation of the IPO or termination of the Engagement Agreement, entitling Boustead to act as CleanCore's financial advisor on economic terms at least equal to those in the Engagement Agreement. (*Id.* ¶¶ 9, 12–13, Ex. 1 §§ 2(a)(ii)–(iii), 7.)

On April 26, 2024, CleanCore closed on its IPO, with Boustead successfully facilitating the listing of CleanCore's shares on the New York Stock Exchange and raising $5 million. (*Id.* ¶ 15.) Before the Engagement Agreement expired, CleanCore entered into two transactions without disclosing them to Boustead or giving Boustead an opportunity to participate as required under the

[1] "Ex" refers to an exhibit attached to Boustead's Complaint (Dkt. 1, 1-1, 1-2, 1-3, 1-4).

Engagement Agreement: the Sanzonate Transaction on February 21, 2025, and the April Private Placement Offering on April 16, 2025. (*Id.* ¶¶ 16–17, 20–21.) CleanCore effectively prevented Boustead from having the opportunity to participate as contractually required and failed to compensate Boustead for either transaction. (*Id.* ¶¶ 18–19, 22–23.)

### B. The Parties Negotiated Two Settlement Agreements to Resolve CleanCore's Payment Defaults.

On or about April 29, 2025, CleanCore informed Boustead that it had no intention of paying the amounts owed pursuant to the Sanzonate Transaction and April Private Placement Offering and sought to terminate the Engagement Agreement. (Compl. ¶ 24.) After extensive negotiation, the parties entered into a settlement agreement on June 5, 2025 (the "First Settlement Agreement"), pursuant to which Boustead agreed to terminate the Engagement Agreement in exchange for: (1) an initial payment of $100,000; (2) warrants for 39,176 shares of CleanCore's common stock (the "Initial Warrants"); (3) warrants for an additional 160,824 shares upon CleanCore's closing of pending transactions aggregating $50,000,000 or more; and (4) a payment of $1,050,000 at the closing of such transactions. (*Id.* ¶ 25, Ex. 3 §§ 1–4 (Dkt. 1-3).) CleanCore executed and delivered the Initial Warrants to Boustead on June 10, 2025. (*Id.* ¶ 26.)

In late July or early August 2025, CleanCore unilaterally sought to modify the First Settlement Agreement, asserting that it could not deliver the $1,050,000 cash payment or 160,824 warrants owed because it was in the process of closing on a private investment in public equity offering (the "PIPE Offering"). (*Id.* ¶ 27.) On August 20, 2025, Boustead agreed to accommodate CleanCore's request and enter into a second settlement agreement (the "Second Settlement Agreement"), in which it released CleanCore from its obligation to pay the contingent cash and warrants in exchange for the immediate issuance of 375,000 registered and freely tradeable common shares (the "Settlement Shares"), and the retention of the Initial Warrants and $100,000

initial payment. (*Id.* ¶ 28, Ex. 4 §§ 1–3 (Dkt. 1-4).)

The Second Settlement Agreement contains the operative terms at issue in this action. Section 1 of the Second Settlement Agreement ("Section 1") governs the issuance of the Settlement Shares and provides, in full:

> 1. Share Issuance. In lieu of CleanCore's payment, warrant and closing obligations set forth in paragraphs 1 through 5 of the Settlement Agreement, CleanCore agrees to immediately issue[] Three Hundred Seventy-Five Thousand (375,000) common shares of CleanCore (the "Settlement Shares"), **which shall be free trading without any restrictions** and **shall be included in the next registration statement filed by CleanCore**, with the Settlement Shares being registered for resale no later than September 30, 2025 (the "Registration Date").

(Ex. 4 § 1 (emphasis added).) Section 2 of the Second Settlement Agreement ("Section 2") entitles Boustead to retain the Initial Warrants, stating:

> 2. Prior Payment and Warrant Retention. Notwithstanding the terms set forth in Paragraph 1 above, the Parties understand and agree that Boustead shall be entitled to retain the $100,000 payment previously paid by CleanCore in accordance with Paragraph 1 of the [First] Settlement Agreement, and **Boustead shall be entitled to retain the warrants issued in accordance with Paragraph 2 of the Settlement Agreement**, in addition to receipt of the Settlement Shares.

(*Id.* § 2 (emphasis added).) The Second Settlement Agreement also contains a mutual release (the "Mutual Release"), providing, in relevant part:

> 3. Mutual Releases. The Parties agree, **in anticipation of and *conditioned upon* the satisfaction of the obligations set forth in Paragraph 1 above**, to fully and generally release, acquit, and forever discharge each other Party . . . of and from any and all past or present claims and/or causes of action relating to or arising from any aspect of the Boustead Agreements and the Settlement Agreement. ("Released Claims.") . . . Notwithstanding the foregoing, **this Paragraph 3 of the Second Settlement Agreement *shall not apply to any action or claims to enforce the provisions of this Second Settlement Agreement.***

(*Id.* § 3 (emphasis added).) The Mutual Release is conditional "upon the satisfaction" of CleanCore's obligation to issue the Settlement Shares in the manner required under Section 1 (i.e., in the next registration statement after the Second Settlement Agreement was executed or if no

such registration statement is filed, no later than September 30, 2025), and expressly excludes "any action or claims to enforce the provisions" of the Second Settlement Agreement. (*Id.*) Section 10 further provides that "[n]othing shall limit Boustead's right to pursue other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief **with respect to CleanCore's failure to timely deliver the Settlement Shares free of all restrictions**." (*Id.* § 10 (emphasis added).)

### C. CleanCore Breached Multiple Provisions of the Second Settlement Agreement.

Section 1 of the Second Settlement Agreement provides that the Settlement Shares shall be "free trading without any restrictions," shall be "included in the next registration statement filed by CleanCore," *and* shall be "registered for resale no later than September 30, 2025." (Ex. 4 § 1.)

#### 1. *CleanCore Failed to Register the Settlement Shares for Resale by the Contractual Deadline, Causing Boustead Over $2.3 Million in Losses.*

Six days after execution of the Second Settlement Agreement, CleanCore filed a Registration Statement, Amendment, Prospectus Supplement, and Amended and Restated Prospectus Supplement (collectively, the "Prospectus") with the SEC. (Compl. ¶ 33.) The Prospectus constituted "the next registration statement filed by CleanCore," but omitted the Settlement Shares. (*Id.*) On August 29, 2025, CleanCore's shares closed at $6.86 per share, giving the Settlement Shares a value of $2,572,500 if they were able to be sold because they were registered as CleanCore contractually agreed. (*Id.* ¶ 34.) Between August 29 and September 11, 2025, Boustead left numerous unreturned voicemail and email messages seeking an update on the registration of the Settlement Shares and inquiring why they were not included in the Prospectus. (*Id.* ¶ 35.)

On September 8, 2025, CleanCore closed on the PIPE Offering, raising more than $175,000,000—a transaction made possible only because Boustead agreed to release CleanCore

of its $1,050,000 payment and related warrant obligations with the understanding that CleanCore would comply with the Second Settlement Agreement. (*Id.* ¶ 36.) On September 24, 2025, CleanCore filed an S-3 Registration Statement (the "September S-3") containing the Settlement Shares. (*Id.* ¶ 42.) The September S-3 was subject to SEC review before the Settlement Shares could be registered and freely trading. (*Id.*) As of the September 30, 2025 deadline (the "September Deadline"), the Settlement Shares had not been registered for resale. (*See id.* ¶¶ 42–50.)

On Friday, November 7, 2025, CleanCore filed a request to withdraw the September S-3 and submitted another registration statement as a well-known seasoned issuer (the "WKSI S-3"). (*Id.* ¶¶ 50–53.) The WKSI S-3 registered the Settlement Shares instantly without SEC review; however, CleanCore filed it at the close of the trading day without notifying Boustead. (*Id.*) Boustead discovered the WKSI S-3 filing on November 11, 2025, by which time CleanCore's shares had declined to $0.47 per share, reducing the value of the Settlement Shares to approximately $176,000. (*Id.* ¶¶ 53–54.)

2. *CleanCore Delivered Defective Warrants and Ignored Boustead's Repeated Demands to Cure.*

In June 2025, CleanCore delivered the Initial Warrants, but they were incorrectly issued. (Compl. ¶¶ 26, 40.) As such, they were not exercisable and essentially worthless. When Boustead discovered the defect on September 24, 2025, it emailed CleanCore demanding cancellation of the incorrect warrants and prompt execution of the correct Initial Warrants. (*Id.* ¶ 40.) At that time, CleanCore's shares were trading at $2.38 per share; had the correct Initial Warrants been reissued, Boustead would have received $93,238.88 upon exercise. (*Id.* ¶ 41.) Despite Boustead's demands on October 2, October 7, October 15, and October 16, 2025, CleanCore failed to cure the defective Initial Warrants. (*Id.* ¶¶ 43–48.) On November 4, 2025, Boustead sent CleanCore a formal demand for payment of damages incurred because of CleanCore's breaches of Sections 1 (Settlement

Shares) and 2 (Initial Warrants) of the Second Settlement Agreement. (*Id.* ¶ 48.) CleanCore did not respond. (*Id.* ¶ 49.)

## **STANDARD OF REVIEW**

Defendant's Motion is based on Fed. R. Civ. P. 12(b)(6), under which a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating whether a complaint survives a motion to dismiss, the court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that *all the allegations* in the complaint are true (even if doubtful in fact)." (emphasis added) (internal citations omitted)); *see also McCray v. Lee*, 963 F.3d 110, 116 (2d Cir. 2020) ("[T]he court 'must accept as true all of the factual allegations contained in the complaint.'" (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007))). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court's review is limited to the Complaint and the documents integral to it; absent conversion to summary judgment, the Court may not consider matters outside the pleadings. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–54 (2d Cir. 2002). As demonstrated below, the Complaint satisfies this standard.

## **ARGUMENT**

CleanCore argues that dismissal is warranted for two reasons: (1) Defendant complied with its contractual obligations under the Second Settlement Agreement *solely* by filing a registration statement by September 30, 2025 (Mot. at 4–7); and (2) Defendant abided by its obligations under the First Settlement Agreement *solely* by delivering the defective Initial Warrants, and the Second

Settlement Agreement imposed no new requirements and is silent regarding the correctness and timing of the issuance (*id.* at 7–8).

A claim for breach of contract requires the following elements: "(1) the existence of a contract between [the plaintiff] and [the] defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by [the] defendant; and (4) damages to the plaintiff caused by [the] defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (applying New York law) (citations omitted). Defendant's Motion disputes only the third element, *i.e.*, whether CleanCore breached the Second Settlement Agreement.

Under New York law, a "written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (internal citations omitted); *see also Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) ("[W]e must give full meaning and effect to all of [the contract's] provisions." (internal quotation marks and citations omitted)).

CleanCore does not contend that the Second Settlement Agreement is ambiguous, and as a result, extrinsic evidence of the parties' intent should not be considered. *See W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."); *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467–68 (2d Cir. 2010) (unambiguous agreement must be interpreted "without the aid of extrinsic evidence" (internal quotation omitted)). And even if the Court were to find the agreement ambiguous,

dismissal would still be improper, because "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 56–57 (2d Cir. 2012) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004)).

The following allegations are fatal to Defendant's Motion: (1) Defendant breached the Second Settlement Agreement by failing to include the Settlement Shares "in the next registration statement filed by CleanCore" and by failing to issue the 375,000 Settlement Shares to be "free trading without any restrictions" before the September Deadline (Facts § C.1; Ex. 4 § 1); and (2) Defendant breached the same by depriving Boustead of its right to "retain" the Initial Warrants because they were defective upon issuance and Defendant neglected to cure the defect despite numerous demands from Boustead (Facts § C.2; Ex. 4 § 2).

### A. The Complaint States a Plausible Claim That CleanCore Breached Section 1 by Failing to Issue "Free Trading" Shares "Registered for Resale" by September 30, 2025.

The plain language of Section 1 of the Second Settlement Agreement imposes three mandatory conditions on CleanCore to effectuate the "immediate[]" issuance of the Settlement Shares: (1) the shares must be "free trading without any restrictions"; (2) they must be "included in the next registration statement filed by CleanCore"; *and* (3) they must be "registered for resale no later than September 30, 2025." (Facts § B; Ex. 4 § 1.) Each condition is conjunctive; CleanCore was obligated to satisfy all of them.

The Complaint alleges that CleanCore failed to comply with the first and second conditions, yet the Motion focuses solely on the third, which was simply a last date by which the first and second conditions had to occur if they had not occurred prior thereto. Within six (6) days

of executing the Second Settlement Agreement, CleanCore filed the Prospectus—the next registration statement—with the SEC, yet omitted the Settlement Shares entirely. (Facts § C.1; Compl. ¶ 33; Ex. 4 § 1.) CleanCore then waited until weeks after closing on the PIPE Offering to file the September S-3 on September 24, 2025, triggering SEC review. (Facts § C.1; Compl. ¶ 42.) By the September Deadline, the Settlement Shares remained unregistered and not freely trading. (*Id.* ¶¶ 42–50.) On November 7, 2025, CleanCore withdrew the September S-3 and filed the WKSI S-3 without notifying Boustead. (*Id.* ¶¶ 50–53.) Boustead discovered the registration on November 11, 2025, by which time the Settlement Shares' value had plummeted from $2,572,500 to approximately $176,000. (*Id.* ¶¶ 53–54.) These allegations state a plausible breach of contract claim under Section 1.

CleanCore's contention that Section 1 required only the *filing* of a registration statement by September 30, 2025 (Mot. at 7), ignores the first two (2) conditions and CleanCore's own post-deadline conduct. CleanCore voluntarily agreed to "immediately" issue Settlement Shares that would be "free trading without any restrictions" and to include them in "the next registration statement filed" by CleanCore, with a hard deadline for the shares to be "*registered for resale*" by September 30, 2025—not merely *filed with a registration statement* by that date. (Facts § B; Ex. 4 § 1.) CleanCore's interpretation contradicts the unambiguous language of Section 1.[2] Moreover, even under CleanCore's reading, CleanCore breached: it withdrew the September S-3 on November 7, 2025, and the Settlement Shares did not become registered and freely trading until the WKSI S-3 was filed—over a month after the deadline. (Facts § C.1; Compl. ¶¶ 50–53.) Under any interpretation, CleanCore breached.

[2] If there is any ambiguity, the Motion must fail. *See Bayerisch*e, 692 F.3d at 56-57.

CleanCore's fallback argument—that Boustead's interpretation of the September Deadline is "commercially unreasonable" (Mot. at 5)—fails for multiple reasons. *See In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (internal citations omitted)). First, Boustead's claim does not rest solely on the September Deadline; CleanCore breached multiple conditions of Section 1, including the requirements that the shares be "free trading without any restrictions" and included in the "next registration statement." Second, the parties' reasonable expectations—as reflected in the Complaint and the Second Settlement Agreement—were the prompt resolution of Boustead's outstanding claims under the Engagement Agreement and First Settlement Agreement. (Facts § B; Compl. ¶¶ 24–28.) Nothing in the Complaint, the First Settlement Agreement, or the Second Settlement Agreement suggests any intent to prolong performance.

Next, CleanCore's invitation to find that the government shutdown and SEC review process would have rendered performance implausible is an improper factual finding at the motion to dismiss stage—and is belied by the allegation that the Settlement Shares became freely trading immediately upon filing of the WKSI S-3 in November 2025. (Facts § C.1; Compl. ¶¶ 50–53.) Lastly, CleanCore's assertion that Boustead's interpretation makes "CleanCore's performance depend[ent] on a third party beyond its control" (Mot. at 5) does not establish commercial unreasonableness. CleanCore cites no authority for the proposition that a contract relying on third-party performance is "disfavor[ed]" by courts. (*Id.*) In substance, CleanCore is advancing an impossibility defense by introducing extrinsic evidence about the timing of the SEC review process—an argument that is both improper at this stage and legally insufficient.

Under New York and Second Circuit precedent, impossibility must be "produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 153 (2d Cir. 2023) (quoting *Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902 (1987)); *see Kel Kim*, 70 N.Y.2d at 902 (refusing to excuse performance where the obstacle "could have been foreseen and guarded against when [the party] specifically undertook that obligation"); *see also United States v. Winstar Corp.*, 518 U.S. 839, 905–06 (1996) (plurality opinion) ("[I]f [the risk] was foreseeable there should have been provision for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed." (internal quotation and citation omitted). Setting aside Boustead's objection to CleanCore's improper reliance on facts outside the Complaint, the involvement of the SEC was clearly anticipated and foreseeable by the parties. (Facts § B; Ex. 4 § 1.) CleanCore concedes it knew at the time of execution that it would need to file a registration statement (Mot. at 5–6), and it therefore assumed the risk that the SEC might take time to review the September S-3. CleanCore chose to wait until six (6) days before the September Deadline to file the September S-3, then withdrew it over a month later to file the WKSI S-3, which required no SEC review. (Facts § C.1; Compl. ¶¶ 42, 50–53.) CleanCore's purported impossibility was entirely self-inflicted: CleanCore could have filed as a WKSI from the outset—as it ultimately did on November 7, 2025—and registered the Settlement Shares instantly without any SEC review. CleanCore cannot now evade liability for a breach resulting from a foreseeable step in the share issuance process and its own delay, nor can it invoke an impossibility defense to impose a novel interpretation of the agreement that contradicts its plain language.

CleanCore's reliance on *Rosenblatt v. Christie, Manson & Woods Ltd.*, 195 F. App'x 11 (2d Cir. 2006) (summary order), is inapposite. In *Rosenblatt*, the Second Circuit affirmed summary

judgment against a plaintiff whose reading of a commission agreement was "implausible" in light of the agreement's "clear language." *Id.* at 12. Here, CleanCore does not argue that Boustead's reading is implausible within the four corners of the Second Settlement Agreement. Instead, CleanCore introduces extrinsic allegations about the length of a typical SEC review process to contend that the parties must have intended something other than what the agreement says. (Mot. at 5–6.) But extrinsic evidence cannot manufacture ambiguity where none exists. *See W.W.W. Assocs.*, 77 N.Y.2d at 163 ("[E]xtrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."); *Greenfield*, 98 N.Y.2d at 569 ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

Even where courts consider extrinsic evidence, they will reject interpretations that are "irreconcilable" with that evidence. *See DivX, LLC v. Harman Int'l Indus., Inc.*, 237 A.D.3d 466, 468 (1st Dep't 2025) (finding defendant's interpretation of a release agreement "irreconcilable with the significant extrinsic evidence" showing the carveout's intended scope). And any purported industry custom regarding SEC registration timelines falls far short of the showing required under New York law—namely, that the custom was "'so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto.'" *Law Debenture*, 595 F.3d at 466 (internal citations omitted). CleanCore does not identify, let alone substantiate, any such uniform custom—and could not do so on a motion to dismiss. The contract says, "registered for resale"—not "filed for registration."

The language of Section 1 is unambiguous: CleanCore agreed to issue Settlement Shares that would be "free trading without any restrictions," "included in the next registration statement

filed by CleanCore," ***and*** "registered for resale no later than September 30, 2025." (Ex. 4 § 1.) Boustead's interpretation gives effect to each of these terms; CleanCore's does not. At this stage, there is no basis to find that Boustead's interpretation—the one consistent with the contract's plain language—is commercially unreasonable or implausible. CleanCore is a sophisticated commercial party that negotiated and executed the Second Settlement Agreement with full knowledge of its terms. Courts routinely enforce contracts as written between sophisticated parties, even where one party later regrets its bargain. *See Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pitt.*, 530 F. Supp. 3d 447, 456 (S.D.N.Y. 2021) (declining to "rewrite the agreement to relieve a sophisticated contracting party . . . from terms that it later deems disadvantageous" (internal quotation omitted)). If CleanCore was concerned about its ability to register the Settlement Shares by the September Deadline, it could have negotiated different terms—or simply used the WKSI filing method from the outset, which it ultimately did on November 7, 2025.

CleanCore's characterization of Boustead's reading as "superfluous" (Mot. at 5–6) cuts against CleanCore's own position. By arguing that Section 1 "focuses" on filing a registration statement by the September Deadline rather than on effectiveness (*id.* at 5), CleanCore ignores the provision as a whole. The "effectiveness" requirement is embodied in the first two conditions—that the shares be "free trading without any restrictions" and "included in the next registration statement." (Facts § B; Ex. 4 § 1.) CleanCore's logic in working backwards from the registration deadline renders these mandatory conditions superfluous—the very defect it attributes to Boustead's reading. *See Giray v. Ulukaya*, 212 A.D.3d 439, 440–41 (1st Dep't 2023) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." (quoting *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001))).

Indeed, CleanCore's own logic cuts against it: if Section 1 required only that CleanCore file a registration statement by September 30, 2025, the parties would have "simply stated" so, with "no need to reference" the other conditions. (*See* Mot. at 6.) Boustead's reading gives effect to every term; CleanCore's does not. The Motion should be denied as to Section 1.

### B. The Complaint States a Plausible Claim That CleanCore Breached Section 2 by Depriving Boustead of Its Contractual Right to "Retain" Exercisable Initial Warrants.

Section 2 provides that "Boustead shall be entitled to retain the warrants issued in accordance with Paragraph 2 of the Settlement Agreement, in addition to receipt of the Settlement Shares." (Facts § B; Ex. 4 § 2.) These warrants refer to the Initial Warrants issued by CleanCore under its obligations in the First Settlement Agreement. (*Id.*) The Complaint alleges that CleanCore incorrectly issued the Initial Warrants, that Boustead repeatedly notified CleanCore of the defect, and that CleanCore failed to cure. (Facts § C.2; Compl. ¶¶ 40, 43–48.) These allegations state a claim for breach of Section 2.

CleanCore's assertion that Section 2 "imposed no new obligations regarding the Initial Warrants" and "confirmed only Plaintiff's right to retain them" (Mot. at 7) is sophistry. "Retain" means "to keep in possession or use." *Retain*, Merriam-Webster, https://www.merriam-webster.com/dictionary/retain (last visited Sept. 10, 2026). Section 2 therefore contemplates Boustead's continued ability to possess *and exercise* the Initial Warrants. The Motion characterizes the defects as mere "technical errors" (Mot. at 8), but those errors made the warrants unusable and worthless. Section 2 does not "establish[] a deadline" for correction (*id.*) because the Initial Warrants were supposed to be correct and exercisable upon issuance—a requirement inherent in their purpose as consideration.

The timing of Boustead's discovery of the defect is a red herring. Section 2 also provides that Boustead "shall be entitled to retain the $100,000 payment previously paid by CleanCore." (Ex. 4 § 2.) If CleanCore had paid by check and that check later bounced for insufficient funds, Boustead would have a remedy—no one would argue that Section 2 required the check to clear by a specific deadline beyond delivery. The same logic applies here. Warrants, by their nature and purpose, give the holder discretion over *when* to exercise in order to maximize return. Interpreting Section 2 to mean that CleanCore satisfied its obligation by delivering defective, unusable warrants would produce an absurd result. *See Lipper*, 1 A.D.3d at 171.

CleanCore invokes the Mutual Release in Section 3 as a bar to Boustead's Section 2 claim. (Mot. at 7–8.) The argument fails. The Mutual Release is unambiguously "conditioned upon the satisfaction of the obligations set forth in Paragraph 1" and "shall not apply to any action or claims to enforce the provisions" of the Second Settlement Agreement. (Facts § B; Ex. 4 § 3.) The Complaint adequately alleges that CleanCore did not satisfy its Section 1 obligations, rendering the Mutual Release inapplicable. Moreover, "one may not take advantage of a condition precedent, the performance of which he himself has rendered impossible." *Kooleraire Serv. & Installation Corp. v. Bd. of Educ. of City of N.Y.*, 28 N.Y.2d 101, 106 (1971) (internal quotation omitted). CleanCore cannot invoke the Mutual Release as a defense to its own breach. And even had CleanCore complied, the Mutual Release expressly carves out claims to enforce the Second Settlement Agreement—including Boustead's Section 2 claim. *See DivX*, 237 A.D.3d at 467–68 (affirming denial of summary judgment where plaintiff's claims "were expressly preserved in the carveout to that separate release agreement").

CleanCore's reliance on *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269 (2011), and *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136 (2d

Cir. 2011), is misplaced. (Mot. at 7–8.) In *Centro*, the release contained “broad language” reaching “all manner of actions . . . whatsoever . . . whether past, present or future, actual or contingent.” 17 N.Y.3d at 277. Here, by contrast, the Mutual Release is conditional and expressly carves out enforcement actions. *Interpharm* is equally inapposite. There, a borrower sued its lender over their credit relationship, and the borrower did not dispute that a forbearance-agreement release of “any and all claims . . . arising at or prior to the date hereof” would bar its claims absent economic duress. 655 F.3d at 140–41. The Second Circuit held the release enforceable because the borrower failed to plausibly plead a wrongful threat, an essential element of economic duress. *Id.* at 142–48. Here, Boustead disputes that the Mutual Release applies at all: it is expressly “conditioned upon the satisfaction of the obligations set forth in Paragraph 1” and excludes “any action or claims to enforce the provisions of this Second Settlement Agreement.” (Ex. 4 § 3.) Unlike the plaintiff in *Interpharm*, Boustead does not seek to assert released claims—it seeks to enforce the very agreement that contains the release. Boustead’s Section 2 claim is an action to enforce the Second Settlement Agreement; it is not “the subject of the release.” *See Interpharm*, 655 F.3d at 142 (quoting *Centro*, 17 N.Y.3d at 276). The Motion should be denied as to Section 2.

## CONCLUSION

This action is one of several efforts undertaken by Boustead to obtain relief from CleanCore’s persistent disregard of its contractual obligations. When CleanCore breached the Engagement Agreement by refusing to compensate Boustead, the parties negotiated the First Settlement Agreement. When CleanCore unilaterally sought to modify those terms to close the PIPE Offering, Boustead accommodated by entering into the Second Settlement Agreement. CleanCore failed to comply with those terms and now seeks to escape liability through strained and wholly-flawed contract interpretation.

The Complaint states plausible claims for breach of the Second Settlement Agreement. CleanCore agreed to issue Settlement Shares that would be "free trading without any restrictions," to include them in the "next registration statement," *and* to register them for resale by September 30, 2025. CleanCore breached each of these obligations. CleanCore also agreed that Boustead would "retain" the Initial Warrants—yet delivered defective warrants that Boustead could not exercise, and ignored repeated demands to cure. CleanCore's attempt to rewrite Section 1 as a mere "filing" obligation, and to invoke the Mutual Release as a shield against its own non-performance, finds no support in the plain language of the Second Settlement Agreement. Accepting the Complaint's well-pleaded allegations as true and drawing all reasonable inferences in Boustead's favor, Plaintiff Boustead Securities, LLC respectfully requests that the Court deny CleanCore's Motion to Dismiss.

DATED: September 30, 2026
New York, New York

FBT GIBBONS LLP

By: */s/ Edward W. Larkin*

Edward W. Larkin, Esq.
Lola Ashirmetov, Esq.
1 Pennsylvania Plaza
Suite 4515
New York, New York 10119
Tel: (212) 613-2000
elarkin@fbtgibbons.com
lashirmetov@fbtgibbons.com

*Counsel for Plaintiff,*
*Boustead Securities, LLC*

## PRINTING SPECIFICATIONS CERTIFICATE

1. Pursuant to Local Civil Rule 7.1(c), I hereby certify that the foregoing memorandum of law was prepared on a computer using Microsoft Word. A proportionally spaced typeface was used, as follows:

Name of typeface: Times New Roman

Point size: 12

Line spacing: Double

2. The total number of words in this memorandum of law, excluding the caption, table of contents, table of authorities, and signature block is 5,599 words.

DATED: September 30, 2026
New York, New York

*/s/ Edward W. Larkin*
Edward W. Larkin, Esq.